UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-60007-CIV-ALTMAN/Hunt

**SAILBOAT BEND SOBER LIVING, LLC**, *et al.*,

     *Plaintiffs*,

v.

**THE CITY OF FORT LAUDERDALE**,

     *Defendant*.

_____/

## ORDER

Before the Hon. Roy K. Altman:

Sailboat Bend is a for-profit business—owned by a self-proclaimed "serial entrepreneur" and "real estate investor"—that offers housing to recovering addicts. Looking to skirt a host of fire-safety and zoning laws, Sailboat Bend filed this lawsuit, in which it accuses the City of Fort Lauderdale of disability discrimination. In particular, Sailboat Bend alleges: (1) that the City's zoning ordinance is facially discriminatory; (2) that the City failed to grant Sailboat Bend a reasonable accommodation by rejecting its request for an exemption from the fire code; and (3) that the City intentionally discriminated against Sailboat Bend (mainly) by prosecuting it for violations of the building and fire codes. But Sailboat Bend's accusations of discrimination find no support in the record. Instead, the undisputed facts demonstrate that, if anything, the City treated Sailboat Bend *better* than similarly situated groups of unrelated co-habitants. Because Sailboat Bend's thinly veiled attempt to dodge the costs of complying with the fire code fails, the City's Motion for Summary Judgment [ECF No. 53] (the "Motion") is **GRANTED**.

## THE FACTS

Sailboat Bend Sober Living, LLC ("Sailboat Bend LLC") is owned, in part, by Carl Bergstrom ("Mr. Bergstrom") and Iryna Bergstrom ("Mrs. Bergstrom") (collectively, the "Bergstroms"). *See* City's Statement of Undisputed Material Facts [ECF No. 54] ("City's SOMF") ¶ 1. Mr. Bergstrom, a self-proclaimed "serial entrepreneur" and "real estate investor," owns (together with his wife) several single-family homes in Florida. *Id.* ¶ 12. The Bergstroms offer these homes for rent. *Id.* Sailboat Bend LLC, Mr. Bergstrom, and Mrs. Bergstrom (collectively, "Sailboat Bend" or the "Plaintiffs") bring this lawsuit against the City of Fort Lauderdale (the "City") based on the following events.

In early 2008, the Bergstroms began searching for a new investment property. *Id.* In March of that year, the Bergstroms purchased the property at 1110 SW 1st Street, Fort Lauderdale, Florida (the "Property" or "Sailboat Bend Home"). *Id.* ¶ 13. The Bergstroms bought the Property—as fifty-fifty partners with John and Astrid Puente, who are not parties to the case—for $144,000. *Id.* The purchase was seller-financed, and the buyers contributed "rather small amounts" of cash at closing, in what Mr. Bergstrom characterized as "kind of a sweetheart deal." *Id.* The owners operate the Property through Sailboat Bend LLC. *Id.* ¶ 19 n.1.

At the time of the purchase, the Property was in disarray and subject to a demolition-by-neglect order. *Id.* ¶ 15. In his attempt to make the Property suitable for rentals, Mr. Bergstrom spent three months renovating the Property. *Id.* Throughout these renovations, the Property's basic structure remained the same and consisted of (1) a main building with nine bedrooms, two bathrooms, one kitchen, and one living room; and (2) a detached structure with a single bedroom and bathroom. *Id.* ¶ 2. The Bergstroms have tabbed "full occupancy" of the Sailboat Bend Home at eleven tenants, though occupancy rates have fluctuated over the years. *See* Sailboat Bend's

Response to Statement of Undisputed Material Facts [ECF No. 62] ("Sailboat Bend's Response to SOMF") ¶ 19.

When they bought the Property, the Bergstroms intended to operate Sailboat Bend Home as a for-profit business that would offer housing to people addicted to alcohol and other drugs. *See* City's SOMF ¶¶ 12, 14. The Property is located near a Salvation Army rehabilitation program, which has offered a steady stream of tenants. *Id.* ¶ 19. Since the business's inception in 2008, the owners have charged $150 per tenant per week—with tenants typically paying their rent in cash. *Id.* ¶¶ 18–19. Until 2017, tenants did not sign a lease or any other documents relating to their occupancy. *Id.* ¶ 19. There are no restrictions on how long a tenant can stay at the Property. *Id.* Indeed, while one tenant lived in the home for years, others "barely make it the first night." *Id.* The typical stay lasts no more than a few weeks or months. *Id.*

By all accounts, the parties' relationship proceeded rather smoothly for the first four years of Sailboat Bend's operations. *Id.* ¶ 21. The tides changed, however, in April 2012, when the City received a citizen's complaint from someone who purported to be a resident of the Sailboat Bend Home. *Id.* The complainant reported (among other things) that the Property had exposed electrical boxes hanging from the ceiling; that it lacked fire alarms and smoke detectors; and that occupants in the home were "smoking heavily" and "nodding out," causing burn marks. *Id.*[1]

Following the complaint, the City opened an investigation that included inspections by both a Building and a Fire Inspector. *Id.* ¶ 22. After examining the Property, the Building Inspector opened two Building Code enforcement actions. *Id.* ¶ 23. The first, which was for "running a group

---

[1] At his deposition, Mr. Bergstrom testified that he knew who made the complaint and that the person had, at one point, lived in the Sailboat Bend Home. *See* Deposition of Carl Bergstrom [ECF No. 55-1] at 48:23–49:12. There is absolutely no indication in the record that this complaint was made for any reason other than to report hazardous conditions at the Property.

home," was closed within a day once the Building Inspector determined that "the facility had a business tax [license] as motel with 7 units." *Id.* ¶ 24. The second was (primarily) for unpermitted work on the Property, including renovations to the kitchen, the bathrooms, and a detached structure, as well as—in what would later become a major source of contention—the installation of a central AC unit. *Id.* ¶¶ 23, 25–26. This second action required months of coordination before Mr. Bergstrom and the City finally reached the following two-pronged resolution: *First*, Mr. Bergstrom obtained or produced permits for all the unpermitted work at issue, except for the Property's central AC unit. *Id.* ¶ 25. *Second*, as to the AC unit, the parties recognized that there was no after-the-fact permit that would render the unit compliant. *Id.* ¶¶ 25–26. So, Mr. Bergstrom consulted with an engineer and, ultimately, decided to remove the unit altogether upon finding that a new system would be, in his words, "outrageously expensive." *Id.* ¶ 26.

During this same time (April 2012), a Fire Inspector examined the Property and, in a subsequent report, identified several code violations. *Id.* ¶¶ 29–30. *First*, the Fire Inspector's report noted that there were certain "small requirements that must be met in order to continue to occupy the house." *Id.* ¶ 29. Those requirements included (1) ensuring that all battery-powered smoke detectors functioned as designed, (2) testing the smoke detectors weekly and maintaining a log of those tests, and (3) installing code-compliant fire extinguishers on each floor of the building. *Id. Second*, the report pointed out that the Property's "use" was "under research" to determine "which code applies," and explained that "[a]fter the use has been defined there will be other fire and life safety requirements that will have to be met." *Id.* ¶ 28.[2]

---

[2] In addition to the permitting issues, the Building Inspector also determined that—although the Property held a grandfathered-in license to operate as a hotel/motel—the Property was no longer being used for that purpose. Mr. Bergstrom testified that he turned in his hotel/motel license after the Building Inspector discovered the license and told Mr. Bergstrom that the Property was a "single family home"—not a hotel/motel. Sailboat Bend's Response to SOMF ¶ 27.

As relevant here, there are three "uses" that determine "which code applies" for fire-safety purposes. These uses, set out below, are defined in the National Fire Protection Association's Life Safety Code (the "Life Safety Code" or "Fire Code"), and are incorporated into Florida law, *see* Fla. Stat. § 633.202(2):

- **One- and Two-Family Dwellings** are defined as "buildings containing not more than two dwelling units in which each dwelling unit is occupied by members of a single family with not more than three outsiders, if any, accommodated in rented rooms." Life Safety Code § 24.1.1.1 (2012).

- **Lodging or Rooming Houses** are defined as "buildings that provide sleeping accommodations for a total of 16 or fewer persons on either a transient or permanent basis, with or without meals, but without separate cooking facilities for individual occupants." *Id.* § 26.1.1.1.

- **Residential Board and Care Occupancies** are defined as "occupanc[ies] used for lodging and boarding of four or more residents, not related by blood or marriage to the owners or operators, for the purpose of providing personal care services." *Id.* § 3.3.188.12.

In short, one- or two-family dwellings have three or fewer unrelated persons; the other uses have more than three. *Id.* §§ 3.3.188.12, 24.1.1.1, 26.1.1.1. What's important to note here is that there are certain fire-safety requirements that apply to "Lodging or Rooming Houses" and "Residential Board and Care Occupancies"—but not to "One- and Two-Family Dwellings." In particular—and as relevant here—only the former two require the building to install an "automatic sprinkler system." *See id.* §§ 26.3.6, 32.2.3.5; Fla. Stat. § 633.208(8)(a).

Days after his initial inspection of the Sailboat Bend Home, the Fire Inspector conducted a follow-up inspection, at which he concluded that the Property should be classified as a "Lodging or Rooming House." *Id.* ¶ 30. Based on this classification, the Fire Inspector issued a new report, which listed various Fire Code violations, including—in what would become the second major source of contention between the parties—the absence of "an approved automatic sprinkler system." *Id.* The new report noted that the City would re-inspect the Property within thirty days. *Id.* ¶ 31. Although the parties agree that this re-inspection never occurred, they disagree as to why.

*Id.*; *see also* Sailboat Bend's Statement of Material Facts in Opposition to Summary Judgment [ECF No. 61] ("Sailboat Bend's SOMF") ¶ 50.

For its part, Sailboat Bend claims that, once it removed its central AC unit (the main point of disagreement in the Building Code action), the City assured it that, "if the Sailboat Bend Property was operating like a single-family residence, it did not need to meet any further requirements." *Id.* Sailboat Bend thus insists that, when no re-inspection took place (and after it heard nothing further from the City), it justifiably believed that the matter had been resolved. *Id.* The City, on the other hand, says that there was no re-inspection—not because the City determined that the Property was a single-family residence—but because the Fire Inspector went on medical leave soon after his initial investigation and because, before he could complete his evaluation of the Property, he retired on account of that medical issue without handing the case over to another inspector. *See* City's SOMF ¶ 31.

Either way, after the 2012 Building and Fire Code enforcement actions, the Sailboat Bend Home eluded any conflict with the City for several years—and, during that time, pushed to expand its business. *Id.* ¶¶ 31–37. In particular, in early 2016, the Bergstroms tried to become certified with the Florida Association of Recovery Residences ("FARR"). *Id.* ¶ 33. The FARR certification process involved the Bergstroms adopting a more formal system for the sober home. *Id.* As part of that process, for example, Mrs. Bergstrom became a certified recovery resident, and the home obtained specialized, sober-home insurance coverage at a cost of $2,000 to $3,000 per year. *Id.* Beyond FARR certification, Mr. Bergstrom also refurbished the Property by, for instance, laying new carpet, repainting the interior, purchasing new beds, and adding matching linens. *Id.* ¶ 35. The Plaintiffs hoped that these investments would allow them to both raise rent *and* market the home

to a new group of residents: young opioid addicts. *Id.* ¶ 36. As Mr. Bergstrom put it in his deposition: "[T]he kids are on insurance, they've got parents, and they would pay more." *Id.*

The Bergstroms also sought to recover some of the money they had invested in the Property. *Id.* ¶ 32. To that end, in May 2016, they decided to refinance the mortgage on the Property. *Id.* To facilitate that refinancing, the Puentes conveyed their interest in the Property to the Bergstroms. *Id.* That conveyance did not impact the fifty-fifty partnership in the Property. *Id.* Once the Property was refinanced, Mr. Bergstrom paid himself, out of the mortgage funds, $30,000, which returned to him the total amount of money he had invested in the Property since 2008. *Id.*

To summarize, then, Mr. Bergstrom simultaneously used the mortgage to pay himself $30,000 *and* subjected the Property to a full-scale revamp in the hopes of catering to a new clientele who would pay more (perhaps significantly more) than $150 per week. But he refused to install a fire sprinkler system—which apparently costs $30,000—because it would require him to raise his tenants' rent beyond $150, which (Sailboat Bend now says) is more than its residents can afford. *See* Sailboat Bend's SOMF ¶ 40.

In December 2016, after four years of relative calm, Sailboat Bend found itself (again) engulfed in a new wave of Building Code and Fire Code enforcement actions. *Id.* ¶ 37. On December 12, 2016, a Building Inspector examined the Property and identified a series of violations, including (1) the absence of an operable fire extinguisher or smoke detector; (2) the lack of any current business license; and (3) several emergency escape routes that had been blocked by boarded windows or AC units. *Id.* ¶ 39. This preliminary assessment led the City to levy two (new) Building Code enforcement actions against the Sailboat Bend Home.

The first alleged that the Plaintiffs had converted the Property's main structure from single-family use to a rooming house and that they had turned the detached structure into a living space—both without City approval. *Id.* ¶ 42. After conducting a thorough investigation that included reviewing old "microfiche" films (which outlined the Property's history), speaking with Mr. Bergstrom, and inspecting the Property, the City determined that the issues raised in this action were unwarranted. *Id.*[3] The City thus dropped these claims from consideration. *Id.*

The second action addressed the following Building Code violations: (1) blocked emergency escape openings caused by Sailboat Bend's decision to board up one window and to install window AC units in several others; (2) unpermitted work on both a converted attic space and the detached structure; (3) unpermitted plumbing work; (4) unpermitted electrical work; (5) a lack of inspections for the unpermitted work; and (6) the Property's unpermitted (and uncertified) change of use and occupancy from a single-family home to a rooming house. *Id.* ¶ 40. About one month after the City notified the Plaintiffs of these violations, the City re-inspected the Property and found that the Plaintiffs had failed to address *any* of the violations. *Id.* ¶ 41. The City thus noticed the violations for a July 25, 2017 hearing before the Code Enforcement Board. *Id.*

As in 2012, this new round of inspections was accompanied by a Fire Code enforcement action. On May 5, 2017, a meeting took place between Mr. Bergstrom, his then-attorney, a Building Inspector, a Fire Inspector, a City Attorney, and a Zoning Administrator. *Id.* ¶ 43. At that meeting, the City told Mr. Bergstrom that the Property was being used, not as a single-family dwelling, but either as a Residential Board and Care Occupancy or a Rooming House. *Id.*[4] The

---

[3] The Building Inspector testified that this case was closed because "Mr. Bergstrom stated that there was no one staying on the premises." *See* Deposition of Jose Abin [ECF No. 55-10] at 48:24–49:1.

[4] Sailboat Bend appears to contest the City's allegation that, at the meeting, the Fire Inspector advised Mr. Bergstrom that the Property constituted either a Residential Board and Care

Fire Inspector explained that, under either of these two classifications, the Fire Code would apply to the Property. *Id.* Specifically, the Fire Inspector said that, as either a Residential Board and Care Occupancy or a Rooming House, Sailboat Bend would have to install an automatic sprinkler system—which Mr. Bergstrom believed would cost between $30,000 to $40,000. *Id.* ¶ 45.

Three days after the meeting, on May 8, 2017, the Fire Inspector examined the Sailboat Bend Home and identified ten separate violations of the Fire Code. Specifically, the Fire Inspector found that: (1) the Property needed to comply with certain primary-means-of-escape requirements; (2) the building design included an unprotected vertical opening (a stairway); (3) the secondary means of escape were non-compliant; (4) the smoke alarms did not comply with the Fire Code; (5) smoke alarms did not appear in every sleeping room; (6) the Property lacked an automatic fire sprinkler system; (7) there was no fire alarm system; (8) the attic space was used for storage and was unprotected; (9) there was no approved emergency evacuation plan; and (10) the Property's change of use required approval before it could be used as a Residential Board and Care Facility. *Id.* ¶ 46. Later that month, the Fire Inspector issued a notice, setting the action for a July 25, 2017 hearing before the Code Enforcement Board. *Id.* ¶ 48.[5]

---

Occupancy or a Rooming House. *See* Sailboat Bend's Response to SOMF ¶ 44. But the document Sailboat Bend cites in support of its opposition actually summarizes the meeting and completely verifies the City's allegation. *See* Inspection Report [ECF No. 55-8] Ex. 6. While a plaintiff's say-so may not ordinarily be discounted at summary judgment, the Court may disregard self-serving averments that are "blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013).

[5] In its Statement of Material Facts, the City cited to "App. 1, Ex. 14" for the proposition that the Fire Inspector set a hearing before the Code Enforcement Board. City's SOMF ¶ 48. In response, Sailboat Bend pointed out that "Appendix 1 does not contain an Exhibit 14. Accordingly, Plaintiffs dispute Paragraph 48." Sailboat Bend's Response to SOMF ¶ 48. But it seems clear that the City simply cited to the incorrect portion of the record—and that it intended to cite to App, 4, Ex. 14, which directly supports the City's assertion. The Court will, therefore, disregard Sailboat Bend's disputation because (1) it never cites to any portion of the record that contradicts the City's

Which brings us to the Code Enforcement Board proceedings—proceedings that addressed both the one remaining Building Code action (insufficient egress from the Property) and the one and only Fire Code violation (the absence of an automatic sprinkler system). At the July 25, 2017 hearing, the Code Enforcement Board found (in a final order) two Building Code violations at the Property—specifically, that (1) Sailboat Bend had blocked emergency escape routes by boarding one window and installing AC units in several others; and that (2) Sailboat Bend had performed unpermitted and un-inspected work at the Property. *Id.* ¶ 49. In a separate final order, the Code Enforcement Board agreed with the Fire Inspector as to all ten of the charged Fire Code violations. *Id.* ¶ 50. Both final orders required Sailboat Bend to remedy the violations by August 22, 2017. *Id.* ¶ 51. Sailboat Bend never appealed those final orders. *Id.* ¶ 52.

Instead, five days before the deadline to remedy the violations, Sailboat Bend's out-of-state attorney, Stephen Polin, sent the City Attorney a letter entitled "Reasonable Accommodation Request" (the "Letter"). *See* Sailboat Bend's SOMF ¶ 25. Although the Letter's demands are not entirely clear, Sailboat Bend appeared to request two accommodations, both of which—in essence—sought to avoid the automatic sprinkler system. *Id.* ¶¶ 26–27. In the first "accommodation," the Letter asked the City to waive the limitations on the maximum number of unrelated persons who can reside together as a family under the Life Safety Code and to treat the Sailboat Bend Home as a single-family use (to which the Fire Code does not apply). *Id.* ¶ 26. In the second "accommodation," the Letter urged the City to "narrowly tailor[]" the Life Safety Code by "taking into account that the residents of Sail Boat Bend are fully ambulatory, and are fully capable of responding to a fire emergency in the same manner as families and those related by

characterization, and (2) the correct document shows that the City's averment is beyond genuine dispute.

blood, marriage or adoption." *Id.* ¶ 29. Sailboat Bend avers that the City failed to respond to the Letter. *Id.* ¶ 28. The City counters that it addressed the Letter in a public hearing, and that, in any event, it was under the impression that it did not have to respond because Sailboat Bend's lawyer was not licensed in Florida. *See* City's SOMF ¶¶ 53, 57.

As in 2012, the parties began to work together towards a resolution—mainly, it appears, with respect to the blocked windows (Building Code) and the automatic sprinkler system (Fire Code). *Id.* ¶ 55. On August 22, 2017—the deadline for Sailboat Bend to fix the violations—the Code Enforcement Board held another hearing at which it extended the deadline to comply. *Id.* ¶ 54.

Ultimately, Sailboat Bend satisfied both the Building Code and the Fire Code—largely by reducing its occupancy to three tenants. *Id.* ¶¶ 56–61. As to the Building Code, reducing the home's occupancy to three enabled Sailboat Bend to remedy the blocked-windows violations by providing all occupants with sleeping rooms that had, in addition to the door, *at least* one alternative means of escape. *Id.* ¶ 60. As to the Fire Code, reducing the home's occupancy to three allowed Sailboat Bend to qualify as a single-family home—and, thus, enabled Sailboat Bend to avoid the automatic sprinkler system requirement. *See* Life Safety Code § 24.1.1.1 (defining single-family home as containing "not more than three outsiders").[6] As part of this solution, the Fire Inspector—to ensure that the Property would fall squarely within the definition of a single-family home—also required Sailboat Bend to remove its name from FARR's list of certified recovery residences. *See* Sailboat Bend's SOMF ¶ 56. At a November 28, 2017 hearing, the Code Enforcement Board agreed to impose no fines on the Property. *See* City's SOMF ¶ 62.

---

[6] The Fire Inspector also found that Sailboat Bend had remedied all other fire violations. *See* City's SOMF ¶ 61.

The final point of contention between the parties is Ordinance No. C-18-11 [ECF No. 55-17] (the "Zoning Ordinance"), a zoning ordinance the City enacted on April 17, 2018. Under the Zoning Ordinance, residential zoning districts are (mostly) limited to families. *See* Zoning Ordinance § 3. A "family" is defined as:

> One (1) or more persons living together and interrelated by bonds of consanguinity, marriage or legal adoption, or a group of persons up to three (3) in number who are not so interrelated, occupying the whole or part of a dwelling as a single housekeeping unit, supplied with a kitchen or facilities for doing their own cooking on the premises, and who share common living facilities.

*Id.* § 6. In other words, groups of related persons, regardless of size, can live in the residential zoning districts. Groups of unrelated persons, with disabilities or without, may *also* reside in the residential zoning districts—so long as not more than three unrelated persons live together. The converse, though, is also true: groups of *more than three* unrelated persons—with or without disabilities—are generally *not* permitted to live in the residential zoning districts.

But the City has carved out an exception to that general rule for homes that serve residents with disabilities. *Id.* § 5. Specifically, while unrelated persons (in groups of more than three) are generally prohibited from residing in residentially zoned areas, the City has made an exception for groups of disabled tenants. The consequence is that, while groups of more than three unrelated and *non-disabled* persons are *barred* from living together in residential zones, groups of more than three unrelated and *disabled* persons are *permitted* to live in residential zoning districts—so long as their homes meet certain specified requirements. In short, the Zoning Ordinance —recognizing that sober homes provide an essential service by offering "a residential environment conducive to rehabilitation for persons with disabilities," *id.* at 1—treats disabled folks *better* than similarly situated non-disabled folks.

The City has accomplished all this through the Zoning Ordinance's provisions on "Family Community Residences" (longer-term homes for the disabled) and "Transitional Community

Residences" (shorter-term homes for the disabled). *Id.* §§ 5–6. A Family Community Residence is "a type of community residence that is a relatively permanent living arrangement for more than three (3) unrelated people with disabilities with no limit on how long a resident may live in the home. The length of tenancy is measured in years." *Id.* § 6. A Transitional Community Residence, by contrast, is "a type of community residence that is a temporary living arrangement for more than three (3) unrelated people with disabilities with a limit on length of tenancy that is measured in weeks or months, not years." *Id.*[7]

A licensed Family Community Residence (long-term home) is permitted within all residential zoning districts *as of right* if the residence (1) houses between four to ten residents and (2) is located at least 1,000 feet from any other Community Residence. *Id.* § 5. A licensed Transitional Community Residence (shorter-term home) is also permitted within multifamily zoning districts *as of right* if the residence (1) houses between four and ten residents and (2) is located at least 1,000 feet from any other Community Residence. *Id.* As outlined in Daniel Lauber's Report—the Report the City principally relied on in designing the Zoning Ordinance—the distance requirement is intended to, among other things, prevent the clustering of recovery homes, which may interfere with the City's ability to foster normalization and community integration. *See* Lauber Report [ECF No. 55-18] at 27. But, even if a home fails to meet the residential district's zoning restrictions *as of right* (say, by failing the 1,000-foot requirement), it may *still* be permitted in the residential zones if it either (1) applies for, and receives, "reasonable

---

[7] The Zoning Ordinance defines a "disability" as a "physical or mental impairment that substantially limits one (1) or more of an individual's major life activities, impairs an individual's ability to live independently, having a record of such an impairment, or being regarded as having such an impairment. People with disabilities do not include individuals who are currently using alcohol, illegal drugs, or using legal drugs to which they are addicted, or individuals who constitute a direct threat to the health and safety of others." Zoning Ordinance § 6.

accommodation approval" or (2) agrees to certain "conditional use requirements." Zoning Ordinance §§ 2–3, 5.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

## ANALYSIS

Sailboat Bend has sued the City under both the Americans with Disabilities Act (the "ADA") and the Fair Housing Act (the "FHA"). "Title II of the ADA prohibits public entities from discriminating against individuals with disabilities." *Quality of Life, Corp. v. City of Margate*, 805 F. App'x 762, 766 (11th Cir. 2020) (citing 42 U.S.C. § 12132). "The FHA prohibits, among other things, discrimination on the basis of a handicap in the sale, rental, and financing of 'dwellings'

and in other housing-related matters." *Id.* (citing 42 U.S.C. § 3604(f)).[8] "Due to the similarity of the ADA and the FHA's protections of individuals with disabilities in housing matters, courts often analyze the two statutes as one." *Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1364 (S.D. Fla. 2012). Like the parties, the Court sees no reason to deviate from that practice here.

Sailboat Bend advances three claims against the City: a facial discrimination claim, a reasonable accommodation claim, and an intentional discrimination claim. In the *facial discrimination* claim, Sailboat Bend alleges that the City "enact[ed] an ordinance which facially discriminates against individuals with disabilities." Response to City's Motion for Summary Judgment [ECF No. 60] (the "Response") at 2. In the *reasonable accommodation* claim, Sailboat Bend avers that the City "fail[ed] to grant Sailboat Bend's requested reasonable accommodation to treat the use of [the Property] as a single family use, and the residents of Sailboat Bend as the functional equivalent of a family." *Id.* In the *intentional discrimination* claim, Sailboat Bend accuses the City of "enforcing provisions of the Fire Code inapplicable to Sailboat Bend and its residents [for no reason] other than their status as non-related disabled individuals." *Id.* For the reasons set out below, no reasonable jury could find for Sailboat Bend on any of these three claims.

### A. Facial Discrimination

Courts engage in a "two-step inquiry" to determine whether an ordinance is facially discriminatory in violation of the ADA and the FHA. *United States v. City of Boca Raton*, 2008

---

[8] While the parties do not discuss whether the Sailboat Bend Home is a "dwelling"—or whether Sailboat Bend's residents have a "disability" or "handicap"—the Court need not resolve these questions because Sailboat Bend's claims fail for the reasons set out in this Order. *Cf. Quality of Life*, 805 F. App'x at 767 n.3 ("We needn't resolve the issue here because even assuming that Quality of Life's proposed detox facility could be considered a 'dwelling,' its FHA claims would fail for the reasons we explain in text.").

WL 686689, at *6 (S.D. Fla. Mar. 13, 2008); *see also Jeffrey O. v. City of Boca Raton*, 511 F. Supp. 2d 1339, 1349–50 (S.D. Fla. 2007) (applying the two-part test). In the first step, the plaintiff must make a *prima facie* case that an ordinance facially discriminates against those with disabilities. *City of Boca Raton*, 2008 WL 686689, at *6. The plaintiff does this by proving that the "ordinance singles out disabled individuals with regard to housing and applies different rules to them." *Id.* The government's intent is not relevant to this first question. *Id.*; *see also Caron*, 879 F. Supp. 2d at 1367 ("When considering a facial challenge, intent is irrelevant . . . ."). The focus, rather, is on the face of the challenged statute or ordinance. *Id.*[9]

At the second step (justification), the burden shifts to the government to show that "the differential treatment is justified such that [it] is not a violation" of the ADA or the FHA. *City of Boca Raton*, 2008 WL 686689, at *6. Although the Eleventh Circuit has yet to consider the issue, other circuit courts have devised three main tests to assess whether differential treatment is justified. Under each of these tests, though, ordinances that favor or accommodate individuals with

---

[9] Step one requires the plaintiff to show that the law facially discriminates against those with disabilities. One might suppose that a law that expressly *benefits* those with disabilities does not "discriminate" in violation of the ADA or the FHA at all—and, thus, that a challenge to such a law would fail at step one. Indeed, as the Supreme Court recently noted in the Title VII context, "[t]o 'discriminate against' a person . . . would seem to mean treating that individual ***worse*** than others who are similarly situated." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1740 (2020) (emphasis added); *see also Rodriguez v. Procter & Gamble Co.*, 2020 WL 3103912, at *12 (S.D. Fla. June 10, 2020) ("Intentional discrimination can be established by a facially discriminatory policy: one that explicitly applies ***less favorably*** to some, or all, members of a protected group." (emphasis added)). While the Court is not unsympathetic to this view, as set out below, other courts have held that a law "discriminates" under step one when the law simply treats disabled individuals *differently* from others (regardless of whether that treatment is better or worse). Either way, for our purposes, these courts' discussion of this question ultimately makes little difference here, because even these courts recognize that such a challenge fails at step two (the justification step). In these courts' view, as we discuss below, the law's *favorable* treatment of those with disabilities *justifies* the differential treatment. The only difference in these courts' approach is that the burden, in step two, falls on the municipality—not the plaintiff (as it would in step one)—to establish that the law treats those with disabilities favorably.

disabilities are, unsurprisingly, deemed justified. *See generally Curto v. A Country Place Condo. Ass'n, Inc.*, 921 F.3d 405, 412 (3d Cir. 2019) (Fuentes, J., concurring) (discussing the tests that other circuits have adopted).

The three tests are these. *First*, the Eighth Circuit has adopted the Equal Protection Clause's rational basis test to determine whether an ordinance that subjects disabled persons to differential treatment is justified. *See Familystyle of St. Paul, Inc. v. City of St. Paul*, 923 F.2d 91, 94 (8th Cir. 1991). In the Eighth Circuit's view, the ordinance is justified if it is "rationally related to a legitimate governmental purpose." *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985)); *see also Oxford House-C v. City of St. Louis*, 77 F.3d 249, 252 (8th Cir. 1996) (asking whether the ordinance is "reasonably related to [the city's] legitimate goals"). In applying this test, the Eighth Circuit has recognized that the government may have a legitimate interest in enacting ordinances that favor—or accommodate—individuals with disabilities. *See id.* at 251 (rejecting a facial challenge and emphasizing that, "[r]ather than discriminating against Oxford House residents, the City's zoning code favors them on its face").

*Second*, the Sixth Circuit has held that, "in order for facially discriminatory statutes to survive a challenge . . . , the defendant must demonstrate that they are 'warranted by the unique and specific needs and abilities of those handicapped persons' to whom the regulations apply." *Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 290 (6th Cir. 1996) (quoting *Marbrunak, Inc. v. City of Stow*, 974 F.2d 43, 47 (6th Cir. 1992)). Although this test differs from the Eighth Circuit's, even the Sixth Circuit (at least implicitly) recognized that ordinances that benefit individuals with disabilities—such as by ensuring a deinstitutionalized environment—may satisfy the justification inquiry. *Id.* (noting that "deinstitutionalization is a legitimate goal for the state to pursue").

*Third*, the Ninth and Tenth Circuits have held that differential treatment is justified when the government shows "(1) that the restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1050 (9th Cir. 2007); *see also Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503 (10th Cir. 1995) (holding that "two potential justifications" are "benign discrimination" and "public safety"). The majority of district courts who have addressed this question—including the courts of this District—have adopted this third approach. *See Cmty. House*, 490 F.3d n.5 (noting the majority rule); *City of Boca Raton*, 2008 WL 686689, at *6 (adopting the Ninth and Tenth Circuit's approach with a minor deviation). And this standard is pellucid: even "restrictions" that benefit persons with disabilities are justified. *Bangerter*, 46 F.3d at 1504 & n.22 (emphasizing that the FHA "only makes it illegal 'to discriminate *against* any [handicapped persons].'" (quoting 42 U.S.C. § 3604(f)(2)).

Indeed, it would be quite surprising if ordinances that favored or accommodated those with disabilities violated the ADA or the FHA. After all, in enacting the ADA, Congress declared its intent to further the "Nation's proper goals . . . [of] assur[ing] equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals [with disabilities]." 42 U.S.C. § 12101. The FHA similarly announced that "[i]t is the policy of the United States to provide . . . for fair housing throughout the United States." 42 U.S.C. § 3601. It would be ironic—to say the least—if laws intended to achieve "full participation" and "fair housing" for those with disabilities made unlawful ordinances that furthered those very ends. *See, e.g.*, *Bangerter*, 46 F.3d at 1504 (reasoning that the FHA should not be interpreted to interfere with

Congress' "commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream" (citation omitted)).[10]

---

[10]     In the Title VII context, the Supreme Court has reached the similar conclusion that Title VII "cannot be interpreted as an absolute prohibition against all private, voluntary, race-conscious affirmative action efforts to hasten" racial equality, as it "would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice . . . constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy." *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 204 (1979). This reasoning indicates that decisions and policies that favor those with disabilities should not be deemed unlawful under the ADA or the FHA.

     At the same time, the Supreme Court has suggested that, under Title VII, a race- or sex-conscious plan that favors historically disadvantaged classes must reflect a "moderate, flexible, case-by-case approach." *Johnson v. Transp. Agency, Santa Clara Cty.*, 480 U.S. 616, 642 (1987) (applying the holding of *Weber* in the context of sex discrimination). For three reasons, this Court need not address whether the City's Zoning Ordinance reflects such a moderate, flexible, case-by-case approach.

     *First*, the texts of the statutes are meaningfully different—and their differences suggest that the *Weber* and *Johnson* tests should not apply in the disability context. Title VII prohibits discrimination "*because of* [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2 (emphasis added). In other words, any individual—whether white or black—can claim discrimination "because of" his or her race. The ADA, on the other hand, provides that "no qualified individual with a disability shall, by reason of such disability, . . . be subjected to discrimination"—thereby prohibiting discrimination only against individuals "*with a disability*." 42 U.S.C. § 12132 (emphasis added). The FHA similarly prohibits "discriminat[ion] against any person . . . because of a handicap of . . . that person"—again, making the protected party a person *with* "a handicap." 42 U.S.C. § 3604(f)(2). Unlike Title VII, then, which protects black Americans as much as white Americans, men together with women, under the ADA and the FHA, *only* Americans with disabilities are covered. Because the ADA and the FHA *do not* protect non-disabled Americans, those statutes *do not* circumscribe the extent to which entities can favor the disabled over the non-disabled.

     *Second*, "§ 501 and § 503 [of the Rehabilitation Act of 1973] require all federal employers and federal contractors to adopt affirmative action programs for the handicapped." *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 633 (1984); *see* 29 U.S.C. § 791(b) (requiring federal employers to develop an "affirmative action program plan for the hiring, placement, and advancement of individuals with disabilities"); 29 U.S.C. § 793(a) (requiring certain federal contractors to "take affirmative action to employ and advance in employment qualified individuals with disabilities"). Congress' decision to *require* affirmative action in favor of those with disabilities lends further support to a reading of the ADA and the FHA that would *permit* favorable treatment in our context.

     *Third*, Sailboat Bend—not having ventured in this direction at all—never claims that the Zoning Ordinance reflects a *preference* for those with disabilities, rather than an *accommodation* to the disabled. And accommodations are expressly permitted—sometimes even required—under both the ADA and the FHA. 42 U.S.C. § 12182(b)(2)(A); 42 U.S.C. § 3604(f)(3)(B).

In this case, the Zoning Ordinance delimits residentially zoned districts to "families," defined as any number of "persons living together and interrelated by bonds of consanguinity, marriage or legal adoption, or a group of persons up to three (3) in number who are not so interrelated." Zoning Ordinance § 6. As a default, then, the Zoning Ordinance bars groups of four or more *unrelated* individuals from living together within residentially zoned neighborhoods. *Id.* But the City carved out an exception for those with disabilities, allowing *them* to live in residentially zoned neighborhoods *as of right*, so long as they comply with certain basic conditions (such as the 1,000-foot and licensing requirements). *Id.* § 5.[11] The consequence is that, while groups of more than three unrelated and *non-disabled* persons are *barred* from living in residentially zoned areas, groups of more than three unrelated and *disabled* persons are generally *permitted* to live in residential zoning districts. *Id.* Thus, although the Zoning Ordinance treats people with disabilities *differently* under step one, it treats individuals with disabilities *better* than those without disabilities—and it is, therefore, justified under step two.

---

*Fourth*, Sailboat Bend's entire argument is premised on the notion that it has been treated *worse* than people without disabilities. In this respect, Sailboat Bend's position is the polar opposite of some hypothetical claim that the Zoning Ordinance is unlawful because it treats its residents *better* than those without disabilities. Sailboat Bend, in short, has waived any argument that the ordinance is unlawful, under *Weber* or *Johnson*, because of the manner in which it favors those with disabilities. *Cf. Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived."); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

[11] And, again, even sober homes that do not meet those conditions may *still* have the opportunity to operate in the residential zones if they either (1) apply for, and receive, "reasonable accommodation approval" or (2) satisfy certain "conditional use requirements." Zoning Ordinance §§ 2–3, 5.

Although it is (admittedly) not common for individuals with disabilities to (as here) challenge laws that extend favorable treatment to the disabled, other courts have rejected similar challenges.

The Eastern District of North Carolina, for instance, has addressed a case with strikingly similar facts. *See Oxford House, Inc. v. City of Raleigh*, 1999 WL 1940013 (E.D.N.C. Jan. 26, 1999). There, as here, the city's zoning regulations prohibited more than four unrelated people from living together in a single-family zone. *Id.* at *3. Like the City here, however, the City of Raleigh carved out an exception to that rule for "Supportive Housing Residences." *Id.* The Raleigh ordinance only required that each such residence be 375 yards (i.e., more than 1,000 feet) from any other such facility. *Id.* The court rejected the plaintiff's argument that the law was facially invalid, reasoning:

> In fact, the City of Raleigh's zoning rules do not discriminate on their face against those protected by the Americans with Disabilities Act, but discriminate in favor of such individuals. That is to say, no five unrelated individuals who do not fall under the Americans with Disabilities Act may live together in a single-family residential zone anywhere in Raleigh, but the City of Raleigh does allow five or more unrelated individuals who fall under the Americans with Disabilities Act to live together in a single-family residential zone, so long as the spacing requirements are followed.

*Id.* On this basis, the court rejected the plaintiff's challenge and granted the City of Raleigh's motion for judgment on the pleadings. *Id.* at *4. That same reasoning—and conclusion—applies with equal force here.

The District of Utah recently faced a similar set of facts in *Harper v. Lindon City*, 2019 WL 2188910 (D. Utah May 21, 2019). In that case, the city's code capped the number of unrelated people who could live together at four—but provided an exception for persons with disabilities. *Id.* at *5. Those homes—residential facilities serving the disabled—were instead capped at eight. *Id.* Like Sailboat Bend, the plaintiff claimed that the code "facially discriminate[d] against a federally protected class by" limiting recovery homes to eight occupants. *Id.* The *Harper* Court

disagreed. As it explained: "Even though . . . the eight-person cap clearly treats the handicapped differently," that "differential treatment is not unlawful based on the second *Bangerter* justification." *Id.* Indeed, the court continued, because recovery homes were allotted an eight-person cap instead of the generally applicable four-person limit, "the differential treatment is actually beneficial to, rather than discriminatory against, the handicapped." *Id.* (internal quotation marks omitted). The same is true here: Sailboat Bend is subject to beneficial—not discriminatory—treatment, because it is *permitted* to operate in residentially zoned districts, whereas similarly situated, non-disabled persons are not.[12]

Other courts have come to the same conclusion. *See, e.g.*, *Quality of Life*, 805 F. App'x at 769 (rejecting a detox facility's argument that the code's explicit reference to "detoxification facilities" was evidence of discrimination because "[t]he addition of 'detoxification facilities' as a permitted use actually shows that the City's zoning code expressly permits detox facilities, albeit in certain zones"); *Oxford House-C*, 77 F.3d at 251–52 ("Rather than discriminating against Oxford House residents, the City's zoning code favors them on its face. The zoning code allows only three unrelated, nonhandicapped people to reside together in a single family zone, but allows group homes to have up to eight handicapped residents."); *Yellowstone Women's First Step House, Inc. v. City of Costa Mesa*, 2015 WL 13764131, at *5–6 (C.D. Cal. Oct. 8, 2015) (rejecting a facial challenge because, even though the "[o]rdinance clearly treats individuals in drug and/or alcohol recovery differently than others," it actually "benefits individuals with disabilities by providing

---

[12] And, for two reasons, the fact that the Zoning Ordinance imposes certain conditions on sober homes (the 1,000-foot requirement, for instance) does not alter this conclusion. *First*, the beneficial regulation in *Harper* likewise imposed additional conditions on the disabled: they were, after all, subject to an eight-person cap—a fact the court rightly disregarded. *Second*, and more importantly, the added conditions (the 1,000-foot requirement here; the eight-person cap there) still treat disabled persons *better* than similarly situated, non-disabled persons *who cannot live in these zones at all*.

them with . . . alternative housing opportunities that do not exist to others"); *Broussard v. City of Pasadena*, 2010 WL 135331, at *2 (C.D. Cal. Jan. 11, 2010) (rejecting a challenge to a municipal code that limited the number of residents in a boarding house where the "only distinction that the [code] draws between disabled and non-disabled persons is that the [code] permits the operation [of] a boarding house only if its residents are disabled; boarding houses for non-disabled persons are prohibited altogether").[13]

Against the weight of this authority, Sailboat Bend makes three arguments—all unavailing.

*First*, over and over again, Sailboat Bend quixotically claims that the disabled are singled out for *worse* treatment under the Zoning Ordinance. It alleges, for example, that "the 1,000 foot separation requirement between residences . . . discriminat[es] against their particular handicap as compared to persons operating without such disabilities." Response at 5. It goes on to say that the "Ordinance establishes onerous requirements for the establishment of sober living homes." *Id.* And it even suggests that the Zoning Ordinance places a "a stigma on anyone seeking to establish such a facility." *Id.* But Sailboat Bend's position is completely misleading. The undisputed facts show that Sailboat Bend is treated *better* than similarly situated groups of non-disabled persons. While Sailboat Bend, for instance, may need 1,000 feet of separation to operate in a residential district, similar homes of non-disabled persons are not even provided the *opportunity* to live in those same

---

[13] Beyond the case law, this Court's conclusion just makes sense. Imagine, for example, a zoning ordinance that neutrally excluded *all* groups of four or more unrelated people from living together in a particular district. There could be *no* plausible argument that the ordinance discriminated on its face against the disabled—and so, a facial challenge would necessarily fail. *See, e.g.*, *His House Recovery Residence, Inc. v. Cobb Cty.*, 806 F. App'x 780, 785 (11th Cir. 2020) (rejecting a facial challenge where the "[o]rdinance, d[id] not, on its face, treat recovering individuals any differently than non-recovering individuals"). If this (hypothetical) neutral ordinance would be *lawful*—and Sailboat Bend wisely does not suggest otherwise—then it would be absurd to conclude that the Zoning Ordinance, which carves out a *benefit* for individuals with disabilities, is (facially) *unlawful*

residential districts. *See* Zoning Ordinance § 5. Sailboat Bend's argument is thus entirely unanchored from reality.

*Second*, Sailboat Bend contends that the Zoning Ordinance resulted from a general animus, among City officials, against people with disabilities. *See* Response at 4 (discussing the "purpose" of the ordinance). As an initial matter, Sailboat Bend's accusation has no legitimate basis in the record. The accusation, in fact, rests almost entirely on, first, Sailboat Bend's own expert's allegation that "the Ordinance appears to be an effort by the City to engage in exclusionary zoning," *id.* at 6, and, second, on the City's reliance on the Lauber Report, which referred to certain sober homes as "mini-institutions," *id.* at 7 n.2. But Sailboat Bend's expert provided no basis for his conclusory allegation, *see* Declaration of David W. Depew [ECF No. 61-4] ¶ 18, and the Lauber Report simply observed that some sober homes fill large buildings with people in recovery and thus "possess many institutional characteristics and function more like mini-institutions than the biological family," *see* Lauber Report at 15.[14]

In any event, Sailboat Bend's flimsy accusation is entirely beside the point *as a matter of law*. As Sailboat Bend acknowledges: "When a facial challenge is made, the motive of the drafters of the ordinance is irrelevant." Response at 3; *see also Caron*, 879 F. Supp. 2d at 1367 (noting that, "[w]hen considering a facial challenge, intent is irrelevant"); *Marriott Senior Living Servs., Inc. v. Springfield Twp.*, 78 F. Supp. 2d 376, 388 (E.D. Pa. 1999) ("In determining whether an ordinance is invalid on its face, the motive of the drafters of the ordinance is irrelevant.").[15]

---

[14] Even if this observation reflected some animus towards the disabled—which it plainly does not—Lauber, it is undisputed, does not work for the City, and Sailboat Bend cites no case for the novel proposition that *his* personal biases and prejudices, such as they are, can (or should) be imputed to the City.

[15] On the topic of Sailboat Bend's (unfortunate) propensity for muddling its theories, at two points in its brief, Sailboat Bend appears to conflate facial and as-applied challenges. *See, e.g.*, Response at 3 ("[T]he City's enactment of Ordinance C-18-11 [is] discriminatory, both facially and as

*Third*, as support for its position, Sailboat Bend points to *Oxford House, Inc. v. City of Baton Rouge*, 932 F. Supp. 2d 683 (M.D. La. 2013), where the district court found a zoning ordinance facially discriminatory. But *City of Baton Rouge* is entirely inapposite here. In that case, the ordinance provided a "blanket reasonable accommodation" for "special homes"—that is, homes for people with *developmental disabilities* that were licensed and staffed on a twenty-four-hour basis. *Id.* at 690. But other homes for individuals with disabilities—including sober homes (like the plaintiff in that case)—were required to show that the requested accommodation was reasonable and necessary. *Id.* Our case is different. Unlike the plaintiff in *Baton Rouge*, Sailboat Bend has not pointed to *any* onerous requirement the Zoning Ordinance imposed on it—as a sober home—but not on programs that house those with *other* disabilities. More fundamentally, the twenty-four-hour live-in requirement, which the *City of Baton Rouge* court found troubling, is wholly absent from the facts of this case. And, in any event, to the extent that *City of Baton Rouge* can be read as holding that *preferable* treatment for people with disabilities violates the ADA or the FHA, this Court rejects its reasoning—and sides with the long litany of decisions that have come out the other way.[16]

---

applied."); *id.* at 7 ("The City has failed to meet its burden to show that, as a matter of law, the Ordinance is not discriminatory, on its face and as applied . . . ."). This gesturing towards an as-applied challenge is unproblematic. *First*, the court reads the "as-applied" language as simply a misunderstanding—and conflation—of the applicable law, especially since Sailboat Bend only mentions an as-applied theory in passing. *Second*, Sailboat Bend has offered absolutely no evidence with respect to how the Zoning Ordinance is applied, and so, no reasonable jury could resolve this claim in its favor—even if Sailboat Bend *did* intend to raise it. *Third*, because Sailboat Bend made no serious argument in support of an as-applied challenge, the claim is waived. *Cf. Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed waived."); *Case*, 555 F.3d at 1329 ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

[16]   Because federal courts are courts of limited subject-matter jurisdiction, they must "zealously insure [their] jurisdiction." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

\*\*\*

Because the Zoning Ordinance treats individuals with disabilities *better* than those without disabilities, no reasonable jury could find for Sailboat Bend on its facial discrimination claim. The City's Motion for Summary Judgment on that claim is therefore **GRANTED**.

### B. Reasonable Accommodation

A defendant violates the ADA and the FHA by failing to make a reasonable accommodation. *Quality of Life*, 805 F. App'x at 767.[17] "To prevail on a failure-to-accommodate claim, a plaintiff must prove (1) that he is disabled, (2) that he requested a reasonable

---

In safeguarding their jurisdiction, courts must make certain that the plaintiff has standing to bring his case. *See, e.g.*, *AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1359–60 (11th Cir. 2007) (explaining that standing "is a threshold jurisdictional question," and that courts "are obliged to consider standing *sua sponte* even if the parties have not raised the issue" (internal quotation marks omitted)). Standing requires the plaintiff to show (1) an "injury in fact" that is "concrete," "particularized," and "actual or imminent"; (2) "a causal connection between the injury and the conduct complained of"; and (3) that the injury "will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks omitted).

In this case, the Plaintiffs do have standing to challenge the Zoning Ordinance, even though it treats them more favorably than similarly situated individuals without disabilities. *First*, insofar as the Plaintiffs cannot operate the Sailboat Bend Home without complying with certain requirements—requirements that inevitably cost them more money—they have suffered an actual, concrete, and particularized "injury in fact." *See* Compl. [ECF No. 30] ¶ 69. *Second*, the Zoning Ordinance—which implements these requirements—has caused that "injury in fact." *Third*, the Court can redress that injury by striking down, for instance, the Zoning Ordinance's 1,000-foot requirement. In short, the point is not that the Plaintiffs have suffered no injury "in fact"; it is, rather, that, despite whatever injury the Plaintiffs have suffered, the Zoning Ordinance does not, on its face, discriminate against the disabled because it treats them *better* than similarly situated individuals without disabilities.

[17] The ADA makes unlawful a defendant's "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A). Similarly, the FHA proscribes a defendant's "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

accommodation, (3) that the requested accommodation was necessary to afford him an equal opportunity to use and enjoy a dwelling, and (4) that the defendant refused to make the requested accommodation." *Schaw v. Habitat for Humanity of Citrus Cty., Inc.*, 938 F.3d 1259, 1264 (11th Cir. 2019) (cleaned up). The City has moved for summary judgment on the middle two elements: reasonableness and necessity. Ultimately, as set out below, the Court does not decide the thorny question of reasonableness because, under clear Eleventh Circuit precedent, Sailboat Bend has failed to meet its burden of showing that its requested accommodation is "necessary."

### 1. Reasonableness

"Whether a requested accommodation is required by law is highly fact -specific, requiring case-by-case determination." *Cohen v. Monroe Cty.*, 749 F. App'x 855, 857 (11th Cir. 2018) (quoting *Loren v. Sasser*, 309 F.3d 1296, 1302 (11th Cir. 2002)). An accommodation is unreasonable "if it either (1) imposes undue financial and administrative burdens on [the city] or (2) requires a fundamental alteration in the nature of the program." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1220 (11th Cir. 2008) (cleaned up) (quoting *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 288 n.17 (1987)). "A plaintiff carries the initial burden of showing that his proposed accommodation is [facially] reasonable." *Schaw*, 938 F.3d at 1265. "If a plaintiff's request is facially reasonable, the burden shifts to the defendant, who must prove that the accommodation would nonetheless impose an 'undue burden' or result in a 'fundamental alteration' of its program." *Id.* at 1266.

In assessing whether a requested accommodation imposes an "undue burden," courts must consider "whether the requested accommodation is both efficacious and proportional to the costs to implement it." *Schaw*, 938 F.3d at 1265 (quoting *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1289 (11th Cir. 2014)). Put another way, assessing reasonableness requires

courts to "weigh the respective costs and benefits of the accommodation to the parties, performing a 'balancing of the parties' needs.'" *Id.* at 1266–67 (quoting *Bhogaita*, 765 F.3d at 1288). In this respect, as courts have recognized, the fact "[t]hat a requested accommodation poses a threat to public safety has obvious relevance to the reasonableness of the accommodation." *Summers v. City of Fitchburg*, 940 F.3d 133, 140 (1st Cir. 2019); *see also Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 466 (3d Cir. 2002) (finding that a proposed accommodation was unreasonable because it "compromise[ed] the safety of [the city's] residents").

On the "fundamental alteration" prong, the Eleventh Circuit has held that "a proposed accommodation amounts to a 'fundamental alteration' if it would eliminate an 'essential' aspect of the relevant activity." *Schwarz*, 544 F.3d at 1220. As the Eleventh Circuit has (imaginatively) described it, "the difference between an accommodation that is required and a transformation that is not is the difference between saddling a camel and removing its hump." *Schaw*, 938 F.3d at 1265 (cleaned up) (quoting *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001)). The question this Court must ask, then, is: "What is the basic purpose of the rule or policy at issue?" *Id.* at 1266. In answering this question, the judgment of the legislature is afforded *some* weight. *Schwarz*, 544 F.3d at 1223 (noting that, while not "dispositive, we think [the city's] views about what is essential . . . must be considered in our analysis"). In conducting this inquiry, the Court should also consider the extent to which nearby homes are *not* subject to the challenged restriction and whether similarly situated residences are regularly excepted from the restriction. *Id.* at 1221. In such cases, "it will be more difficult to show that a waiver of the rule would cause a 'fundamental alteration.'" *Id.*

The City contends that Sailboat Bend's requested accommodation—that the City waive the automatic fire sprinkler requirement—fails both the "undue burden" *and* "fundamental alteration" tests. *See* Motion at 8–10.

*First*, with respect to the undue burden test, the City submits that waiving the automatic sprinkler system requirement would constitute an unwarranted "threat to public safety." *Id.* at 8. It has a point. In weighing the burden to Sailboat Bend of installing the sprinkler system against the sprinkler system's safety benefits—for both Sailboat Bend's residents and its neighbors—it may very well be that this balancing tips (heavily) in the City's favor. This is especially plausible because the burden of installing the sprinkler system—in this case—is apparently quite minimal. Pointing only to the testimony of Mr. Bergstrom, Sailboat Bend claims that installing the sprinkler system, which costs between $30,000 and $40,000, would require it to raise its rent beyond $150 per week—a higher rate that, according to Sailboat Bend, would "effectively destroy[] the ability of its residents to live in a dwelling of their choice." Response at 14. But the undisputed facts show that Sailboat Bend *already* intended to raise its rates beyond $150 when it decided to revamp the Property to appeal to younger residents who were recovering from opioid addiction. *See* City's SOMF ¶¶ 35–36. The undisputed evidence also establishes that, when the Bergstroms refinanced their mortgage, they paid themselves $30,000—approximately the cost of the sprinkler system— to cover certain investments they had previously made in the Property. *Id.* ¶ 32. Mr. Bergstrom, we must remember, described himself as a "serial entrepreneur" and "real estate investor," and the Bergstroms' business partners (the Puentes) likewise have access to stores of capital. *Id.* ¶¶ 12– 13. On these facts, as the City argues, Sailboat Bend's tale of woe rings rather hollow.

On similar facts, the First Circuit recently rejected a virtually identical argument. *See Summers*, 940 F.3d at 140. In *Summers*, several sober homes brought a reasonable-accommodation

claim against the City of Fitchburg, seeking (like Sailboat Bend) exemption from a fire sprinkler requirement. *Id.* at 136. As the First Circuit explained, the *Summers* Plaintiffs advanced the same position Sailboat Bend submits here:

> The plaintiffs' argument proceeds along the following lines. Installing sprinklers in the sober houses would be costly. Without relief from this requirement, the plaintiffs would have to either raise the prices charged to recovering addicts or reduce the occupancy of the sober houses. Either way, fewer individuals would be able to enjoy the benefit of residing in the sober houses.

*Id.* at 139. The First Circuit rejected that argument. In doing so, the court reasoned that "the plaintiffs provide no basis for finding that the financial burden of compliance with the Sprinkler Law is somehow disproportionate to the public safety gains that flow from requiring them to install sprinklers." *Id.* at 140. The "closest" the plaintiffs came, the court said, was their "naked estimate that installing sprinklers would cost between $35,000 - $40,000 for each sober house." *Id.* But the record contained no evidence "of the extent to which the cost of the sprinklers, amortized over their useful life, would affect prices charged to residents." *Id.* The same is true here: other than Mr. Bergstrom's say-so, Sailboat Bend has provided *no* evidence that installing the sprinkler system would make rent unaffordable for its residents. In short, as in *Summers*, it appears that "the plaintiffs' suggestion that the cost of installing sprinklers is unreasonable is woven entirely out of wispy strands of speculation and surmise." *Id.*

*Second*, the City contends that the sprinkler exemption would result in a "fundamental alteration" of its fire-protection scheme. *See* Motion at 8. On this point, the City notes that the "Florida Legislature has seen fit [to] adopt fire safety standards, including a requirement for automatic sprinkler systems, throughout the State and to make those standards applicable to all but [a] small class of uses—one- and two-family dwelling units." *Id*. at 9 (citing Fla. Stat. §§ 633.202(1)–(2), 633.208(8)(a)). And, according to the City, "[i]t would fundamentally alter the structure [of] the Fire Code and the City's fire prevention services and constitute a threat to public

31

safety to require the City to exempt a certain class of businesses from complying . . . simply because those businesses cater to persons protected by the FHA and the ADA." *Id.* Here, again, the City relies on *Summers*—and, in particular, the First Circuit's conclusion that "exempting the plaintiffs from installing sprinklers would not be a reasonable accommodation because such an exemption would thwart the very salutary purpose of the Sprinkler Law." *Summers*, 940 F.3d at 140.

In response to all this, Sailboat Bend contends that its requested accommodations *were* reasonable under the central teachings of the Eleventh Circuit's decision in *Schwarz*—namely, that where an ADA or FHA plaintiff asks to "use its properties in the same manner as it could use a dwelling across the street, the argument for requiring an accommodation is . . . compelling." *Schwarz*, 544 F.3d at 1225. As Sailboat Bend points out, "there is no indication that Sailboat Bend and its residents require any more fire and life safety protections than an ordinary one to two family residence." *See* Response at 11. And yet, Sailboat Bend notes, it must bear the burden of installing an expensive fire sprinkler system—even as one- and two-family residences across the street do not. *Id.*

Sailboat Bend finds support for its position in several similar cases in which district courts have applied *Schwartz*'s reasoning. In *Oxford House, Inc. v. Browning*, 266 F. Supp. 3d 896 (M.D. La. 2017), for example, the court found Oxford House's request for the city to treat it as a "family" reasonable and held that Oxford House should be exempt from the city's sprinkler system requirement. *Id.* at 916. As the court saw it, because Oxford House's residents "comport themselves like a family," it was reasonable to treat them like one—a conclusion that required the city to forego its sprinkler system requirements. *Id.* at 915–16.

Similarly, in *New Horizons Rehab., Inc. v. State*, 400 F. Supp. 3d 751 (S.D. Ind. 2019), the court, addressing the same facts, reached the same conclusion. In the court's view, the proposed accommodation—which, as here, requested an exemption from the sprinkler requirement—was "reasonable because the cost [in safety] is one [the state] incurs with every single-family home." *Id.* at 763.

Fortunately, the Court need not wade through the froth and ferment of these decisions— which have reached divergent conclusions on the question of reasonableness—because, under clear Eleventh Circuit precedent, no reasonable jury could find that Sailboat Bend's requested accommodation is "necessary." It is to this question that the Court now turns.

### 2. Necessity

To succeed on a failure-to-accommodate claim, a plaintiff must demonstrate that its requested accommodation is "necessary." 42 U.S.C. § 12182(b)(2)(A); 42 U.S.C. § 3604(f)(3)(B). The necessity element ties together the disability and the proposed accommodation in (as relevant here) two ways. *First*, a plaintiff must "show that the accommodation they requested actually alleviates the effects of a handicap." *Schwarz*, 544 F.3d at 1226. *Second*, the plaintiff must demonstrate that the requested accommodation "address[es] *the needs created by the handicaps*." *Id.*[18] This second requirement has a sound basis in both the text of the statute and its resulting

---

[18] These two elements—alleviation and causation—can come apart. Consider the following example. Imagine a wheelchair-bound quadriplegic who lives in an apartment that provides ready access to all floors via an elevator. Imagine, too, that our wheelchair-bound quadriplegic has such a phobia of elevators that she cannot make it up and down the building. So, as an accommodation, she asks the owners to install a set of ramps throughout the building. In such a case, the accommodation (the ramps) would arguably *alleviate* the effects of her disability—specifically, her inability to travel up and down without a wheelchair. But the accommodation would *not* address a need *caused by* her disability. The elevators, after all, already provided her with ready access; the ramps, by contrast, became necessary—or, to put it in ADA-speak, their need was *caused by*—her fear of elevators, not her quadriplegia.

policy considerations: if "accommodations go beyond addressing these needs and start addressing problems not caused by a person's handicap, then the handicapped person would receive not an 'equal,' but rather a better opportunity . . . , a preference that the plain language of [the law] cannot support." *Id.*; *see also Schaw*, 938 F.3d at 1269–70, 1272 (holding that, to be necessary, an accommodation must "alleviate the effect of a disability" *and* must address a need "caused by" the disability).[19]

The federal courts are split on the central question at issue here: whether a disabled person's inability to pay for certain building requirements renders a waiver of those requirements "necessary" under the ADA and FHA. Judge Posner, for example, writing for the Seventh Circuit, rejected the precise argument Sailboat Bend advances here—that its requested accommodation is *necessary* because the cost of installing the sprinkler system would (effectively) price out the sober home's tenants. *See Hemisphere Bldg. Co. v. Vill. of Richton Park*, 171 F.3d 437, 441 (7th Cir. 1999). As Judge Posner explained:

> It could be argued—it has been argued—that if handicaps cause poverty, financial concessions to the handicapped are accommodations. . . . But that would mean that handicapped people, in the name of reasonable accommodation, could claim a real estate tax rebate under the Fair Housing Amendments Act. To support so radical a result, something more than a spinning out of the logical implications of "reasonable accommodation" is necessary. We thus disapprove the district court cases in this circuit which have held that a city must, if requested by a handicapped

---

[19] Those cases that have explored this second requirement—viz. that the disability cause the need—have focused on the language of the FHA itself, which makes clear that discrimination includes a refusal to grant a reasonable accommodation that "may be necessary to afford such person *equal opportunity to use and enjoy a dwelling*." 42 U.S.C. § 3604(f)(3)(B) (emphasis added); *see, e.g.*, *Schaw*, 938 F.3d at 1272; *Schwarz*, 544 F.3d at 1226. While not identical to the FHA, the ADA similarly provides that no person should be discriminated against on the basis of disability "in the full and *equal enjoyment* of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added). Both the ADA and the FHA, then, guarantee *equal* enjoyment—and, thus, the logic of *Schwarz* and *Schaw* (that redressing needs *unconnected* to the disability would further, not equal, but preferential enjoyment) applies equally to both statutes. In short, both the FHA and the ADA require a plaintiff to show that the alleged need is "caused by" the disability.

> person, waive its requirements for the installation of sprinklers because the requirements make homes more expensive for the handicapped—as for everyone.

*Id.* In the Seventh Circuit's view, waiving fire code requirements because of a disabled person's financial ability to pay would stretch the FHA (and the ADA) too far: If that were the law, the court continued, people with disabilities could, not only claim tax rebates, but also ignore "local building code[s]," "minimum wage law[s]," and "regulations for the safety of construction workers," all of which make housing more expensive for people with disabilities (and everyone else). *Id.* at 440. That result, the Seventh Circuit said, would be "absurd." *Id.*; *see also Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 301 (2d Cir. 1998) ("Rather, [the plaintiffs] claim an entitlement to an accommodation that remedies their economic status, on the ground that this economic status results from their being handicapped. We think it is fundamental that the law addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps.").

While the Seventh Circuit's view would easily resolve the parties' dispute here, the Eleventh Circuit has (recently) taken a more-nuanced approach on the issue of financial considerations—an approach that hews more closely to the relevant texts and the purposes that underlie them. *See Schaw*, 938 F.3d at 1272–73. In *Schaw*, the plaintiff (a quadriplegic) did not meet Habitat for Humanity's minimum-income threshold. *Id.* at 1262–63. In his request for an accommodation, he asked the organization to include in his income computation either the amount he received in food stamps or a letter that documented the financial assistance he received from his family. *Id.* Like Judge Posner, the district court held that, "because the requested accommodation went solely to [the plaintiff's] financial condition—not his disability, it wasn't 'necessary' within the meaning of the [FHA]." *Id.* at 1264. The Eleventh Circuit reversed, finding this "too simplistic an explanation." *Id.*

Homing in on the second "necessity" requirement ("caused by"), the Eleventh Circuit held that an individual's inability to pay *can* render an otherwise-reasonable accommodation *necessary*, so long as "there is some causal relationship" between the disability and the inability to pay. *Id.* at 1271. The "proper question" in that case, for example, was "whether [the plaintiff's] inability to meet the minimum-income requirement through wages earned is an 'effect' of his quadriplegia." *Id.* Ultimately, the court remanded the case because the record was unclear on this critical question: whether, put simply, there was a "direct causal link between the impairment and the inability to meet the minimum-income requirement." *Id.* But the Eleventh Circuit noted that, in assessing whether the plaintiff's disability had caused his inability to pay, the district court might consider, for instance, the plaintiff's "pre-accident salary, or whether he lived independently or paid rent anywhere before the accident." *Id.*[20]

---

[20] The Eleventh Circuit's holding is reminiscent of Judge Calabresi's dissent in *Salute. See* 136 F.3d at 302. In that case, the majority rejected the notion that the FHA could be used to "remedy economic discrimination of a kind that is practiced without regard to handicap," reasoning that: "What stands between these plaintiffs and the apartments at Stratford Greens is a shortage of money, and nothing else. In this respect, impecunious people with disabilities stand on the same footing as everyone else." *Id.* Judge Calabresi disagreed:

> If, as the majority asserts, the plaintiffs are disabled individuals who happen to be poor (and thus Section 8 recipients), then the group to which they are compared becomes non-disabled individuals who are poor. Since these latter would-be-tenants are also excluded, no discrimination against the disabled exists.

> But the majority's conclusion depends on the assumption that plaintiffs are poor people who are also, and by chance, handicapped, rather than individuals who are poor *because* they are handicapped. As such—while the majority may or may not prove ultimately to be correct—its position is completely inappropriate at this early stage of the proceedings. For purposes of ruling on the summary judgment motion, we must accept as true the undisputed fact that the plaintiffs are Section 8 recipients *as a direct result* of their handicaps.

*Id.* at 309 (Calabresi, J., dissenting).

Here, however, there is no similar "undisputed fact" that Sailboat Bend's residents could not afford the rent increase *because of* their disability. Indeed—as set out below—Sailboat Bend

Applying these principles to the case at hand, Sailboat Bend must demonstrate that its residents' addiction (the disability) creates an inability to work (the effect on a major life activity)—and, consequently, a need for a waiver of the usual Fire Code requirements. But Sailboat Bend never alleges that its residents' addiction *causes* or *creates* their inability to pay for the sprinkler system. Instead, Sailboat Bend avers only that "[t]he residents of Sailboat Bend Property are typically lower income residents who can only afford to pay $150 a week." Response at 13.[21] Even assuming the truth of this claim, though, Sailboat Bend has adduced *no evidence* to support the proposition that the residents' inability to pay is *caused by* their disability. Sailboat Bend has not shown, for instance, that, considering the residents' pre-addiction salaries or rent payments, they (the residents) *could have* afforded the increased rent before they developed their addiction. On these facts, then, no reasonable jury could find that Sailboat Bend's requested accommodation is necessary. To hold otherwise would, in the Eleventh Circuit's words, "start addressing problems *not caused by a person's handicap*"—and, as a result, afford Sailboat Bend, "not 'an equal,' but rather a better opportunity to use and enjoy a dwelling, . . . a preference that the plain language of [the law] cannot support.'" *Schaw*, 938 F.3d at 1272 (quoting *Schwarz*, 544 F.3d at 1226).

---

has never so much as alleged that "fact," let alone supported it with any evidence. So, even under the more permissive approach outlined in Judge Calabresi's dissent—an approach that, again, this Circuit appears to have adopted in *Schaw*—summary judgment is appropriate here.

[21] Sailboat Bend offers similar assertions throughout its papers. In its own Statement of Material Facts, for example, Sailboat Bend alleges that "[t]he residents of Sailboat Bend are typically lower income residents who can only afford to pay $150 a week." Sailboat Bend's SOMF ¶ 40. Similarly, to support its claim that a rent increase would price out its residents, Sailboat Bend submits the declaration of a Sailboat Bend Home resident, who says only that: "I pay $150 per week to reside at Sailboat Bend Sober Living. If Sailboat Bend Sober Living were to substantially raise its rates, I would not be able to afford to live at Sailboat Bend Sober Living." Declaration of R. William Von Sydow [ECF No. 61-13] ¶ 3.

Trying to duck the jib boom, Sailboat Bend hurls one final argument: that living in a sober home is necessary to alleviate the effects of addiction. Sailboat Bend spends pages (and pages) in its efforts to prop up this claim. *See* Response at 14–17. It insists, for example, that "[t]he need for handicapped people to live in group arrangements for support or to pool caretaker staff has been described as essential." *Id.* at 15 (quoting *Jeffrey O.*, 511 F. Supp. 2d at 1353). It goes on to say that "having a program of at least eight individuals is necessary and a key to the success of sober living homes in helping residents maintain their sobriety and reintegrate into normal life." *Id.* at 16. And it cites experts for the proposition that its model "foster[s] individual recovery by providing a sober environment that promotes self-sufficiency." *Id.* at 15–16.

But the problem with all this is that it's completely irrelevant to the second prong of the necessity inquiry: causation. So, while Sailboat Bend may well have established that its requested accommodation would "alleviate" its tenants' disability (first prong), it never shows that its residents' inability to afford the sprinkler system is *caused by* their disability (second prong)—as opposed to countless other possible causes. This absence of evidence on one of the two prongs of the necessity analysis is fatal to its claim. *See Schaw*, 938 F.3d at 1273 ("The inquiry is whether the requested accommodation would provide a disabled person an opportunity to enjoy a dwelling that would otherwise—*due to his disability*—elude him." (emphasis added)).

***

In sum, no reasonable jury could find for Sailboat Bend on its failure-to-accommodate claim, because Sailboat Bend failed to adduce evidence that the need for its requested accommodation—a waiver of the Fire Code—is "caused by" its tenants' disability. The City's Motion is therefore **GRANTED** as to this claim.

### C.  Intentional Discrimination

Sailboat Bend's final claim—that the City's course of conduct evinces an invidious intent to discriminate against the sober home—fares no better. To prevail on an intentional discrimination (or "disparate treatment") claim, a plaintiff must show that "the defendant[] actually intended or [was] improperly motivated in [its] decision to discriminate" against a protected party. *Bonasera v. City of Norcross*, 342 F. App'x 581, 584 (11th Cir. 2009) (quoting *Reese v. Miami- Dade County*, 242 F. Supp.2d 1292, 1301 (S.D. Fla. 2002)). "Disparate treatment may be proved using either direct or circumstantial evidence." *His House Recovery Residence, Inc. v. Cobb Cty.*, 806 F. App'x 780, 784 (11th Cir. 2020); *see also Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 919 (10th Cir. 2012) (Gorsuch, J.) (noting that the "two ways to prove intentional discrimination" are through "direct proof of the city's discriminatory intent" or through "circumstantial evidence"). Sailboat Bend has neither.

#### 1.  Direct Proof

Direct proof of discrimination involves "evidence, which if believed, proves existence of [the] fact in issue *without inference or presumption.*" *His House*, 806 F. App'x at 784 (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 n.6 (11th Cir. 1987)). So, for example, if a city official "makes discriminatory comments about the disabled while explaining his basis for the contested decision, that is direct evidence of discrimination." *Cinnamon Hills*, 685 F.3d at 920. In this case, Sailboat Bend has not pursued a "direct proof" claim. And for good reason. As far as the Court can tell, there is no direct evidence of discrimination. "Tellingly," for instance, Sailboat Bend "cites not one discriminatory remark or statement made by any member of the [City] as direct evidence of discrimination." *See Palm Partners, LLC v. City of Oakland Park*, 102 F. Supp. 3d 1334, 1343 (S.D. Fla. 2015).

### 2.   Circumstantial Proof

"We analyze circumstantial evidence using the burden-shifting framework provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), which requires a plaintiff to first make a prima facie case of discrimination." *His House*, 806 F. App'x at 784. In assessing whether a plaintiff has established a prima facie case of discrimination, the Eleventh Circuit has employed the factors set out in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). *See Hallmark Developers, Inc. v. Fulton Cty.*, 466 F.3d 1276, 1283 (11th Cir. 2006). Among these are: (1) "discriminatory or segregative effect"; (2) "historical background"; (3) "the sequence of events leading up to the challenged actions"; and (4) "whether there were any departures from normal or substantive criteria." *Id.* (quoting *United States v. Hous. Authority of the City of Chickasaw*, 504 F. Supp. 716, 727 (S.D. Ala. 1980)). All of these factors weigh decisively against Sailboat Bend.

### a.   Discriminatory Effect

The first factor focuses on the *effect* of the government's decision. Courts in this Circuit have looked to (1) whether the city's decision, though neutral on its face and as applied, has a "disparate impact" on individuals with disabilities, *Hallmark*, 466 F.3d at 1285–87, or (2) whether the city has "unevenly enforced" an ordinance, *His House*, 806 F. App'x at 785. As an initial matter, Sailboat Bend, maintaining that "statistical evidence is not required," has proffered no statistical evidence *of any kind* to support its view that the City's actions disproportionately impacted individuals with disabilities. *See* Response at 18. At oral argument, Sailboat Bend candidly conceded that it was not proceeding with a "disparate impact" claim. And this makes sense. The absence of statistical evidence, after all, is dispositive on any such claim. *Cf. Palm Partners*, 102 F. Supp. 3d at 1344 (rejecting intentional discrimination claim, in part, because

"[t]he record [was] devoid of statistics, data, or other helpful information showing any sort of disparate effect").

Nor has Sailboat Bend identified even a *single* instance of selective enforcement—where the City, for instance, applied the Fire, Building, or Zoning Code to a sober home but declined to apply it to (say) a sorority house down the street. To the contrary, the evidence unambiguously suggests that the City's enforcement actions against Sailboat Bend had *nothing* to do with disability. Indeed, the City did not single out the Sailboat Bend Home for enforcement at all. Rather, a purported resident of the home filed a citizen complaint, in which he informed the City that the Property had exposed electrical boxes hanging from the ceiling; that the Property lacked fire alarms and smoke detectors; and that occupants in the home were "smoking heavily" and "nodding out," causing burn marks. It was only *after* it received this complaint that the City opened its investigation. *See* City's SOMF ¶¶ 21–22.[22] The absence of any showing of selective enforcement weighs heavily against Sailboat Bend's intentional discrimination claim. *See His House*, 806 F. App'x at 785 (rejecting a sober home's intentional discrimination claim because the home "fail[ed] to provide sufficient evidence that the County treated them differently from similarly situated non-disabled citizens."); *Bonasera*, 342 F. App'x at 586 (rejecting claim premised on selective enforcement because there was "no evidence that the City was aware of any violations of the single-family zoning ordinance by white homeowners and chose to ignore them").

In response, Sailboat Bend claims that, in fact, it *has* "pointed to other instances where a one and two family dwelling is treated differently." Response at 18.

---

[22] In its SOMF, the City says that (1) it received a complaint from someone purporting to be a resident, City's SOMF ¶ 21, and that (2) "[f]ollowing the complaint," the City inspected the Property, *id.* ¶ 22. Sailboat Bend did not dispute *either* assertion.

*First*, Sailboat Bend alleges that the City only applied the Fire Code to the Property because its residents "are disabled and unrelated." *Id.* at 11, 18. This contention is simply false. The Fire Code applies to the Property *only* because its residents—disabled or not—are a group of more than three *unrelated* persons living together. *See* Fla. Stat. § 633.208(8)(a). The Fire Code's application thus has nothing to do with the tenants' disability.

*Second*, Sailboat Bend says that the City is not "applying the Fire Code to any FARR certified houses." Response at 18. On this point, the record is unclear. *See* Deposition of Robert Kisarewich [ECF No. 55-7] at 89:6–16 (asserting only that initial inspections of FARR-certified homes fall under the building department's jurisdiction and that he does not have "personal knowledge" of actions taken by that department). But, even accepting this claim, Sailboat Bend has not explained how the City's decision *not* to enforce the Fire Code against certified recovery residences—precisely the relief it seeks here—somehow establishes the City's invidious intent to discriminate against those in recovery. It would seem, rather, to support the opposite proposition: that the City does what it can to help the residents of sober homes. There is, in short, no evidence of any discriminatory impact from which the Court—or a reasonable jury—might divine an intent by the City to discriminate against people with disabilities.

### b. Historical Background

The second *Arlington Heights* factor looks to the historical context of the challenged actions. Sailboat Bend has provided no (relevant) historical context here. It has not alleged, for instance, that "the City has a history of trying to restrict the ability of individuals with disabilities from residing in single family areas"; that sober-home plaintiffs have previously raised successful challenges to City ordinances; or that the City has received Department of Justice "warn[ings]" to the effect that its "proposed ordinance[s] would violate the law." *Caron*, 879 F. Supp. 2d at 1368.

Nor has it presented evidence of "any other instance where the City has made a . . . decision adversely affecting people with disabilities." *Palm Partners*, 102 F. Supp. 3d at 1345. To the contrary, the evidence indicates that "the City has a number of group and community residential homes for people with disabilities," *id.*, including "83 certified or licensed recovery residences within its jurisdiction," *see* Lauber Report at 28.[23] Nothing in the relevant historical background, then, suggests that the challenged ordinances spawned from some hostility towards people with disabilities.

### c.  The Sequence of Events

The third factor looks to "the sequence of events" leading up to the challenged actions. In applying this factor, courts often consider evidence of community animus preceding—and perhaps explaining (or even propelling)—a city's actions. *See, e.g.*, *Caron*, 879 F. Supp. 2d at 1369 (finding support for intentional discrimination where "[c]ommunity outrage erupted" after a sober home "applied for a reasonable accommodation"); *Palm Partners*, 102 F. Supp. 3d at 1345 (concluding that the court was "unable to infer discriminatory intent from the sequence of events leading up to the City's" decision, in part, because of a lack of "public opposition"). Courts also consider a city's decision to change the law—suddenly and unfavorably—soon after a sober home is established. *See Vill. of Arlington*, 429 U.S. at 266.

Sailboat Bend has provided no evidence of any public opposition to the Sailboat Bend Home—or even to sober homes generally. Nor has Sailboat Bend suggested that the City nefariously altered its codes shortly after the Sailboat Bend Home was established in 2008. Indeed,

---

[23] Sailboat Bend agrees that, as of 2017, there were dozens of sober homes operating in the City of Fort Lauderdale. *See* Sailboat Bend's Supplemental Declaration [ECF No. 93] at 4.

the only change in the law Sailboat Bend references is the City's enactment of the Zoning Ordinance in 2018—a whole *decade* after the home first opened.

Nonetheless, Sailboat Bend points to two facts in support of its position on this third factor. Both are unpersuasive.

*First*, Sailboat Bend says that the City's decision not "to respond or even acknowledge the reasonable accommodation request sent to the City" evinces an intent to discriminate. Response at 19. But the City *did* discuss the Letter at a public meeting—and, in any event, it believed that it did not have to respond because Sailboat Bend's attorney was not licensed in Florida. *See* City's SOMF ¶¶ 53, 57. Regardless, Sailboat Bend has provided no authority—nor has this Court found any—to support its view that a city's failure to respond to a requested accommodation establishes a discriminatory motive. Instead, decisions on this question recognize only that a city's failure to respond constitutes a rejection of the request—nothing more. *See, e.g.*, *Bhogaita*, 765 F.3d at 1287 (finding only that failing to respond amounts to refusal). This makes sense. City halls are busy places operating on shoe-string budgets. It would seem unfair and counter-productive to require them to respond to every requested accommodation, no matter how ludicrous—on pain of being called out as intentional discriminators. In either event, as should be obvious, no such "respond or admit to invidiousness" obligation appears anywhere on the face of the relevant statutes or in any of the cases interpreting them.

*Second*, Sailboat Bend points to the City's enforcement of its egress—or emergency escape—provisions. Response at 19. Sailboat Bend complains that the City "required Sailboat Bend to remove a central air conditioning unit . . . , and required installation of window air conditioning units." *Id.* "The City," according to Sailboat Bend, "then turned around and claimed violations of its Fire Code, in part based on the modifications it requested." *Id.* The City did no

such thing. Rather, as the undisputed facts establish, after the City cited Sailboat Bend for installing an unpermitted central AC unit, Sailboat Bend weighed two options: it could either (1) install a compliant central AC unit or (2) add window AC units. City's SOMF ¶ 26. It was Sailboat Bend's *own* decision that a new central AC unit would be "outrageously expensive"—as was the decision that followed: the installation of window AC units instead. *Id.* And, while it could have installed these window units in a way that complied with the code, it chose to place the units in places that blocked the Property's secondary means of escape. *Id.* ¶ 49. Contrary to Sailboat Bend's suggestion, then, the City did not bait it into code violations. Instead, the City's actions appear to have been intended to *protect* the Sailboat Bend Home's residents by ensuring that, in case of emergency, they would have access to workable exits. No reasonable jury could deduce an intent to discriminate from these facts.

### d. Deviations from Procedure

The fourth—and final—factor asks whether the city deviated from its ordinary practice. On this factor, the Eleventh Circuit has said that "procedural abnormalities are only relevant within a larger scope." *Hallmark*, 466 F.3d at 1285 (quoting *Macone v. Town of Wakefield*, 277 F.3d 1, 6 (1st Cir. 2002)). Here, the City's broader process involved receiving a complaint, investigating the complaint, and identifying several violations of the code. *See* City's SOMF ¶¶ 21–22. Along the way, the City granted Sailboat Bend several extensions (to give the Home more time to comply with the City's codes), *id.* ¶ 54; negotiated with Sailboat Bend, *id.* ¶¶ 25–26; and even dropped claims it later decided, upon further investigation, were unviable, *id.* ¶ 42. Notably, Sailboat Bend *never* disputes—as a matter of fact—that it failed to comply with the City's codes. The "larger scope" thus indicates no evidence of discrimination.

Sailboat Bend, though, focuses on (what it says are) two deviations from the City's standard operating procedures. Once again, neither is convincing.

*First*, Sailboat Bend points to the deposition of a Fire Inspector, who testified that, when the building inspectors contacted the fire inspectors about Sailboat Bend in 2017, he "[w]as a little surprised" because "it was a single-family residence and normally we would not have a fire account at a single-family residence." Response at 20; Deposition of Robert Kisarewich at 29:20–25. But this testimony establishes no deviation at all. Of course the Fire Inspector would be surprised that a "fire account" had been opened on a single-family residence (to which the Fire Code unambiguously does not apply). *See* Fla. Stat. § 633.208(8)(a). Unbeknownst to the Fire Inspector, however, the original Fire Inspector had opened the "fire account" only after finding that the Sailboat Bend Home was not a single-family residence at all. This initial "surprise," then, does not signal a deviation from normal procedures.

*Second*, struggling to stay afloat, Sailboat Bend makes much of the Fire Inspector's November 2017 insistence that, if Sailboat Bend wanted to return to single-family status, it must remove its name from the FARR website. *See* Response at 20. Although the City never explains why the Fire Inspector said this, the whole episode was rather harmless and, frankly, inapposite. The most natural inference that can be drawn from the comment is that it reflected an innocuous (if ill-conceived) attempt by the Fire Inspector to help Sailboat Bend achieve one of its objectives: a return to single-family use. Since the operation of a for-profit business is—almost by definition—incongruous with that use, removing the indicia of business operations (by, for instance, delisting from the FARR website) would seem to advance, rather than undermine, Sailboat Bend's defense against the City, even as it (admittedly) would hurt Sailboat Bend's standing with potential customers.

But, even assuming that the Fire Inspector's comment constituted a material deviation from normal procedures, it does not support the Plaintiff's view that the City intended to discriminate against Sailboat Bend on account of its tenants' disabilities. Indeed, viewed within the "larger scope" of this record—and in the context of a City that has allowed dozens of sober homes to flourish within its boundaries—no reasonable jury could find that the City's actions were motivated by an intent to discriminate against Sailboat Bend's disabled residents.

### e.  Precedent

Finally, clear precedent from the Eleventh Circuit dispenses with any lingering doubt about whether Sailboat Bend has marshalled enough evidence to survive summary judgment on its disparate treatment claim.

In *His House*, for example, the county denied a sober home's request to house more than the maximum number of persons otherwise permitted under the zoning ordinances. 806 F. App'x at 782. The sober home presented evidence that (1) its mere presence was "met with opposition from citizens whose concerns included [the home's] proximity to a school and playgrounds and the effect of a group home on property values"; (2) the county's ordinance was amended to placate this community pressure; and (3) a county commissioner, referring to the sober home, said (in a public hearing): "if anyone, no matter where you are, approaches your child or anything suspicious in your neighborhood—you need to call 911." *Id.* at 783–85. Despite this evidence, the Eleventh Circuit affirmed the district court's decision to grant summary judgment against the sober home on its disparate treatment claim. *Id.* Sailboat Bend, of course, has provided nowhere near the evidence the Eleventh Circuit found insufficient to withstand summary judgment in *His House*. Again, Sailboat Bend has adduced no evidence of any public opposition to sober homes, no

evidence that the City acted from an intent to placate any such pressure, and no direct evidence that any City official expressed any animosity towards people with disabilities.

Nor was *His House* some mere aberration. In *Quality of Life*, the City of Margate denied a drug-detox facility's request for zoning approval. 805 F. App'x at 766. In asserting its claim of intentional discrimination, the detox facility relied heavily on the mayor's statements "that having a sober house or a drug-recovery facility in a residential community would be a concern as much as any sexual predator . . . who lives in my neighborhood.'" *Id.* at 768. Even with this clear evidence of animus, the Eleventh Circuit (again) affirmed the district court's order granting summary judgment against the detox facility on its intentional discrimination claim. *Id.* at 765. Nothing Sailboat Bend has submitted—not the Fire Inspector's unsolicited website admonition, nor the requirement that emergency escapes remain unblocked, nor even the City's decision not to respond to the Letter—approaches the degree of hostility reflected in the Margate mayor's statements.

***

We are left, then, with no direct evidence of discrimination and circumstantial evidence so slight, so innocuous, so meager that no reasonable jury could use it to find that the City intended to discriminate against Sailboat Bend *because of* its tenants' disabilities. The City's Motion is therefore **GRANTED** as to this claim.

**CONCLUSION**

Accordingly, the Court hereby

**ORDERS AND ADJUDGES** as follows:

1.  The City's Motion for Summary Judgment [ECF No. 53] is **GRANTED**.

48

2. All other pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELED**.

3. The Clerk of Court shall **CLOSE** this case.

4. Pursuant to FED. R. CIV. P. 58, the Court will enter final judgment separately.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 14th day of August 2020.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

49